## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

The Woodmont Company and )
Woodmont Hay Creek, L.P., )
                                )
                Plaintiffs, )      **ORDER ON MOTIONS FOR**
                                )      **SUMMARY JUDGMENT**
    vs. )
                                  )      Case No. 1:17-cv-00073
LaSalle Shopping Center, LLC and )
Hay Creek Development, LLC, )
                                )
            Defendants. )

_____

        This case arises from the development and leasing of commercial real estate for a shopping

center in Bismarck, North Dakota, known as the Hay Creek Shops.  Plaintiffs The Woodmont

Company ("Woodmont") and Woodmont Hay Creek, L.P. ("Woodmont Hay Creek") lodge a six-

count first amended complaint against Defendants LaSalle Shopping Center, LLC ("LaSalle") and

Hay Creek Development, LLC ("HCD").  Doc. No. 52.  The complaint consists of various breach

of contract and related equitable claims.  In retort, the Defendants advance a five-count second

amended counterclaim, asserting contract-based claims of their own in addition to seeking

damages under two North Dakota statutes.  Doc. No. 39.  Before the Court are the parties'

respective motions for summary judgment.  Doc. Nos. 77, 80.  This order resolves all but two of

the claims.

## I.       <u>BACKGROUND</u>

        Anchoring this litigation are two contracts: (1) an Agreement for Leasing Services ("LSA")

between HCD and Woodmont, and (2) a Development Services Agreement ("DSA") between

HCD and Woodmont Hay Creek.  Doc. Nos. 79-1, 79-18.  HCD assigned both contracts to LaSalle

on December 31, 2015.  Doc. Nos. 79-11, 79-19.  An introduction of the parties and a summary of the factual and procedural history follows.

### A.    Introduction of Parties

Woodmont is a Texas corporation headquartered in Fort Worth that offers development, leasing, and property management services for retail shopping centers.  Doc. No. 52, p. 2. Woodmont Hay Creek, as one of approximately 50 Woodmont-affiliated entities, is a Texas limited partnership based in Fort Worth that functioned as the developer for the Hay Creek Shops project.  Id.  Stephen Coslik is Woodmont's Chairman and served as the managing member of Woodmont Hay Creek.  Doc. Nos. 79-1, p. 11; 79-18, p. 14.  Grant Gary, then a Vice President and now President of Brokerage Services for Woodmont, headed up lease solicitation and negotiation with potential tenants for the Hay Creek Shops.  Doc. No. 85-2 at 16:3-10. Woodmont's President of Development Services, Rick Machak, spearheaded the project's development component.  Doc. No. 85-1 at 92:1-20.

LaSalle and HCD are Bismarck-headquartered North Dakota limited liability companies. Doc. No. 52, pp. 2-3.  LaSalle is the owner of the Hay Creek Shops property.  Doc. No. 39, p. 2. HCD holds a 50% ownership stake in LaSalle, with two other investor groups, Bismarck Partners and LaSalle Partners, owning the remainder.  Doc. No. 85-5 at 11:7-12:7.  The two primary individuals behind HCD and LaSalle are Ron Knutson and Jerry Splonskowski.  Knutson is LaSalle's managing member and holds an ownership interest in HCD.  See id.; Doc. No. 79-15, p. 2.  Splonskowski is HCD's managing member and, during the time relevant to this action, he was a partner in Northwest Contracting Inc. ("Northwest"), which provided construction services for the Hay Creek Shops.  See Doc. Nos. 79-1, p. 11; 85-6 at 8:3-8.  Todd Porter represented Bismarck Partners on LaSalle's management committee.  Doc. No. 85-7 at 11:13-17.

B.     **Factual Background**

The business relationships that led to this lawsuit originated from Woodmont's inaugural development endeavor in Bismarck, the Pinehurst Square Shopping Center.  Doc. No. 85-6 at 15:13-18.  Splonskowski worked with Machak on that project in 2006 and 2007, leaving him with a favorable impression of Woodmont.  Id. at 16:14-19.  Several years later, Coslik contacted Splonskowski about additional development opportunities in the Bismarck area.  Id. at 20:6-16.  Splonskowski referred him to a real estate venture called Mandan 94 that owned 30 acres of undeveloped land in north Bismarck.[1]  Id. at 20:17-21:9.  Coslik expressed Woodmont's interest in purchasing the property for the purpose of developing a retail shopping center.  Doc. No. 85-5 at 21:7-18.

To that end, Woodmont Land Company (a Woodmont affiliate not involved in this litigation) entered into an earnest money contract with Mandan 94.  Doc. No. 97-1.  Although the sale had yet to close, Mandan 94 separately granted Woodmont Land Company a license to develop the property.  Id.  Woodmont Land Company started soliciting potential tenants and negotiated several letters of intent and leases.  Doc. No. 85-1 at 43:5-10.  On Woodmont's request, Northwest commenced with construction services.  Doc. No. 85-6 at 23:11-24:10.  Woodmont Hay Creek, a single-purpose entity created for the Hay Creek Shops project, came into existence not long after.  Doc. No. 85-1 at 13:15-19.  Woodmont Land Company then began systematically assigning leases to Woodmont Hay Creek.  Id. at 12:9-13.

In the meantime, the Mandan 94 investors became concerned with how long the land sale was taking to close.  Doc. No. 85-5 at 28:16-29:18.  That concern was vindicated when Woodmont

---

[1] Splonskowski and Knutson each held ownership interests in Mandan 94.  See Doc. No. 85-6 at 20:19-24, 22:10-12.

Land Company's financing prospects collapsed.  Doc. Nos. 85-1 at 17:5-22.  The earnest money contract was terminated, and Woodmont Land Company relinquished any ability to develop the property as a result.  Doc. No. 97-1.  Construction ground to a halt.  Doc. No. 85-6 at 27:18-23. By then, Northwest (and Splonskowski personally) had expended substantial amounts of money and effort on the project's early construction requirements.  Id. at 26:2-5.

Determined to see the project through and to curb further losses, Splonskowski formed HCD with Knutson and one other individual.  Doc. No. 85-5 at 30:2-16.  On December 24, 2014, HCD acquired 100% ownership of the Hay Creek Shops property.  Doc. No. 97-8.  HCD subsequently sought additional financing to resume development of the shopping center. Negotiations ensued with the Berg Group, a commercial real estate outfit from Fargo, North Dakota, resulting in a capital injection sufficient for construction to restart.  Doc. No. 85-6 at 30:1-11.  HCD and the Berg Group ultimately elected not to partner on the Hay Creek Shops project, however.  Doc. No. 85-5 at 47:20-25.  Following entreaties from Knutson and Splonskowski, Bismarck Partners and LaSalle Partners joined forces with HCD to spawn LaSalle.  Id. at 48:1-12. LaSalle then took over ownership of the property and obtained financing that facilitated ongoing development.  Id. at 48:13-25.

While the financing situation unfolded, Woodmont Land Company assigned a batch of leases to HCD on June 25, 2015.  Doc. No. 97-1.  HCD paid Woodmont Land Company commissions for those leases.  See Doc. Nos. 97-2 to 97-5.  Woodmont Hay Creek and Woodmont Land Company later assigned their remaining leases piecemeal to the Defendants.[2]  Doc. No. 85-

---

[2] According to a summary the Defendants submitted, Woodmont Land Company held onto a lease as late as April 2016, while Woodmont Hay Creek still possessed a lease in June 2016.  Doc. No. 85-10.  Neither party has attempted to explain how these entities retained leases without holding an ownership interest in the Hay Creek Shops property.

4

10. Owing to Woodmont's experience with retail shopping center projects, HCD consented to the company remaining involved with the Hay Creek Shops project.  Doc. No. 85-6 at 39:22-33:8, 41:16-25.  Woodmont enlisted to act as HCD's leasing agent and to provide property management services for tenants, while Woodmont Hay Creek agreed to contribute development services.  Id. at 47:4-48:2.  Woodmont accordingly continued to solicit potential tenants and to negotiate letters of intent and leases, but on the Defendants' behalf rather than its own.  Doc. No. 85-1 at 52:2-20.

Neither Woodmont nor any of its employees obtained real estate licenses from the North Dakota Real Estate Commission while working on the Hay Creek Shops project.[3]  Id. at 77:14-15. Coslik and Gary are licensed real estate brokers in Texas.  Doc. No. 85-2 at 9:1-11, 23:13-24:10. The Defendants aver that they were unaware Woodmont lacked a North Dakota real estate license while acting as their leasing agent.  Doc. Nos. 85-5 at 79:4-13; 85-6 at 122:23-124:17; 85-7 at 55:4-57:24.

Initially, there was no written contract that controlled the Woodmont entities' leasing and development services.  After ironing out the details, HCD entered into the DSA with Woodmont Hay Creek and the LSA with Woodmont on October 27, 2015.  See Doc. Nos. 79-1, 79-18.

     1.     Development Services Agreement

The DSA delineated the Hay Creek Shops project into four phases.  Phase 1 was already complete when the DSA retroactively took effect on September 15, 2015.  Doc. No. 79-18, p. 2. The Defendants have not pursued Phases 3 and 4, which were designated in the contract as optional in their discretion.  Id. at 10.  That leaves Phase 2 as the focal point for the current disputes.

---

[3] North Dakota recognizes nonresident real estate brokers' licenses if they submit an application and meet certain requirements.  N.D. Cent. Code § 43-23-10; N.D. Admin. Code 70-02-01-06. There is no evidence in the record that Woodmont or its employees applied for nonresident brokers' licenses.

At a basic level, Woodmont Hay Creek agreed under the DSA to use good faith effort to secure required government permits, impart advice on design plans, lease out available space, and participate in the project's management and day-to-day operations. Id. at 6-7. For leasing in particular, the DSA cross-referenced the LSA, stating that Woodmont would shoulder the responsibility for leasing services. Id. at 8. The operation of the DSA was explicitly not conditional on the LSA's continued existence. Id. A choice-of-law clause selected North Dakota law to govern the DSA. Id. at 13.

The DSA contemplated two forms of incentive-based compensation for Woodmont Hay Creek: The Construction Management Fee and the Construction Management Bonus. Id. at 9. The Construction Management Fee afforded Woodmont Hay Creek a guaranteed 2% cut of the total project costs capped at a maximum of $500,000, to be paid concurrently whenever the Defendants expended funds in furtherance of the project. Id. The DSA expressed that the obligation to pay the Construction Management Fee persisted even if a party terminated the contract for cause. Id. at 4-5. And as relevant here, the Construction Management Bonus provided for a one-time payout of $750,000 upon Woodmont Hay Creek—either directly or through Woodmont—leasing out 95% of the available Phase 2 commercial retail space. Id. at 9-10. The DSA stated that if the LSA were terminated for cause, Woodmont Hay Creek's entitlement to the Construction Management Bonus would terminate in kind. Id. at 10.

The Defendants did not pay Woodmont Hay Creek the Construction Management Fee simultaneous with periodic payments for project costs. See Doc. No. 85-6 at 72:10-73:12. Instead, on February 1, 2017, Knutson sent a letter to Coslik with an enclosed check for $215,949.32, representing 2% of the total project costs for Phase 2 as calculated in an appended summary. Doc. No. 79-20. Included with the letter, though, was a waiver form stating that Woodmont Hay Creek

6

would agree to forfeit all claims against LaSalle by accepting the payment.  Id.  With this litigation impending, Woodmont Hay Creek sent a response letter declining the payment on February 2, 2017.  Doc. No. 79-21.  LaSalle has not paid Woodmont Hay Creek the Construction Management Bonus, either.  To date, Phase 2 has yet to attain the 95% leasing benchmark.  Doc. No. 85-1 at 89:15-21.

      2.     Agreement for Leasing Services

The LSA's overarching purpose was the Defendants' engagement of Woodmont to act as their leasing agent.  Doc. No. 79-1, p. 4.  No effective date provision controlled, meaning the LSA took effect when signed on October 27, 2015.  Id. at 6.  As opposed to the DSA, the LSA's choice-of-law clause declared, "The validity and construction of this Agreement shall be governed by the laws of the State of Texas."  Id. at 10.

Fundamentally, Woodmont committed under the LSA to use good faith effort to lease available space in the Hay Creek Shops.  Id. at 4.  To that effect, Woodmont agreed to "cooperate with [Defendants] in marketing and leasing the Project, all in conformity with the [Defendants'] financial objectives."  Id. at 5.  The LSA also included an obligation for Woodmont to "identify and solicit prospective lessees" and to undertake "negotiation of . . . leases with such prospective lessees."  Id.  A catch-all clause required Woodmont's acquiescence to "such other tasks as [Defendants] may reasonably request in order to assist [Defendants] in achieving . . . financial objectives for the Project and [Defendants'] goal of achieving completion of all leasing of Phase 2 of the Project."  Id.  Woodmont, however, had no authority to execute leases or any other agreements on the Defendants' behalf.  Id.  The decision to accept or reject the leases Woodmont procured rested with the Defendants.  Id.  In return for Woodmont's services, the LSA expressly authorized payment of commissions for executed leases.  Id. at 6-7.  The LSA further stated that

7

either party could terminate the contract for cause 30 days after tendering notice of default if the defaulting party failed to cure. Id. at 8-9.

On November 14, 2016, Knutson sent a letter to Coslik declaring a default under the LSA. The letter cited four justifications, encompassing Woodmont's alleged: (1) failure to consummate a lease with Carter's Retail Inc. ("Carter's/Oshkosh"); (2) failure to properly process a lease with North Dakota Mattress Ventures, LLC ("Mattress Firm") that resulted in LaSalle conceding to abate seven months' rent; (3) failure to provide timely and consistent pro forma lease rent schedules; and (4) offering of a lease to Dollar Tree Stores, Inc. ("Dollar Tree") when doing so violated an exclusive use grant in a preexisting lease with Michaels Stores, Inc. ("Michaels"). Doc. No. 79-15. Tacked on to those four claims, the Defendants later charged two more shortcomings in Woodmont's performance: (5) failure to properly process a lease with Gordmans, Inc. ("Gordmans"), causing the Defendants to enter into a subsequent lease that required them to pay for Gordmans' furniture, fixtures, and equipment ("FFE");[4] and (6) failure to properly process a lease with Kirkland's Stores, Inc. ("Kirkland's") that resulted in LaSalle conceding to abate six months' rent. Doc. No. 39, pp. 6-7. The Court will briefly summarize each accusation.

**Carter's/Oshkosh**.   Woodmont Land Company signed a letter of intent with Carter's/Oshkosh on February 14, 2014. Doc. No. 97-7. When the Defendants assumed ownership of the property, they deemed the terms in that initial letter of intent acceptable and expressed a desire to proceed with a lease. Doc. No. 85-5 at 81:14-25. Woodmont represented to the Defendants on multiple occasions that Carter's/Oshkosh would be moving into the shopping center soon, and that closing the deal was a matter of finalizing the lease and building the space. Id. at

---

[4] In the context of the Gordmans lease, FFE included items such as shopping carts, cashier cages, and rope for waiting lines. Doc. No. 85-6 at 110:20-111:4.

82:19-25.  But after more than two years had elapsed, Carter's/Oshkosh renegotiated second and third letters of intent with Woodmont in July and August 2016, respectively.  Doc. Nos. 97-24, 97-25.  The new letters of intent altered the terms of any future lease in an unfavorable financial direction for the Defendants.  Namely, the new letters of intent called for lower rent and included provisions that allowed Carter's/Oshkosh to cancel the lease if sales did not meet certain thresholds that were higher than those included in the original letter of intent.  See id.  Woodmont never presented a proposed lease to the Defendants from Carter's/Oshkosh.  Doc. No. 85-5 at 83:2-12.

**Mattress Firm**.  Even though HCD already owned the property, Woodmont Hay Creek entered into a lease with Mattress Firm on April 21, 2015.  Doc. No. 79-3.  The lease required the landlord to deliver the premises by October 1, 2015.  Id.  Woodmont apparently did not communicate that deadline to the Defendants until it had already passed.  Doc. No. 97, p. 3.  Failure to meet the delivery date triggered a default under the lease, and Mattress Firm asserted an entitlement to liquidated damages.  Doc. No. 97-9, p. 2.  To settle the quarrel, Woodmont Hay Creek assigned the lease to LaSalle on June 3, 2016 with a retroactive effective date of March 1, 2016.  Doc. No. 79-7.  LaSalle agreed under the assignment to abate seven months' rent to avoid litigation and retain Mattress Firm as a tenant.  Id.  On the same day assignment occurred, Woodmont Hay Creek consented to pay half the rent abatement from its future Phase 2 Construction Management Bonus earnings.  Doc. No. 85-1 at 234:1-6.  The Construction Management Bonus was never paid, however, so Woodmont Hay Creek did not contribute to the rent abatement.  Id. at 234:7-23.

**Pro Forma Statements**.  LaSalle's financing was contingent on continued ability to satisfy loan obligations as evidenced by the regular submission of pro forma financial statements.  Doc. No. 85-7 at 41:16-42:1.  Prospective rent rolls for the shopping center comprised part of those

statements.  The Defendants tasked Woodmont with preparing that information.  Doc. No. 85-5 at 94:24-95:6.   As alleged, Woodmont was frequently dilatory in responding to requests for information; and when information was provided, it was often inconsistent with previous statements.  Id.

**Dollar Tree/Michaels**.  Woodmont Hay Creek inked a lease with Michaels on December 12, 2013.  Doc. No. 79-5.  After the Defendants assumed ownership of the property, Woodmont presented a proposed lease with Dollar Tree.   Doc. No. 85-6 at 91:13-92:10.   Based on Woodmont's representations that Dollar Tree intended to consummate the lease, the Defendants expended funds to prepare space at the shopping center.  Doc. No. 85-7 at 44:19-45:15.  On October 4, 2016, shortly before Dollar Tree planned to open for business, Gary informed LaSalle for the first time that there was a conflict between the proposed Dollar Tree lease and the preexisting Michaels lease.  Doc. No. 97, p. 4.  Specifically, Michaels held the exclusive right to sell certain items at the Hay Creek Shops that Dollar Tree intended to sell.  Id.  LaSalle negotiated an amendment to the Michaels lease to avert the conflict.  Doc. No. 97-10.  The amendment waived Michaels' exclusive use in exchange for a $66,586 rent concession.  Id.  Upon obtaining the waiver, LaSalle entered into a lease with Dollar Tree on December 16, 2016.  Doc. No. 79-12.

**Gordmans**.  Woodmont Land Company signed a lease with Gordmans on August 14, 2013.  Doc. Nos. 97-11 to 97-13.  The original lease did not require Woodmont Land Company to pay for Gordmans' FFE, nor did four subsequent lease amendments.  See Doc. Nos. 97-11 to 97-17.  Then on December 16, 2014, Gordmans and Woodmont Hay Creek (designated as the landlord by that time) executed a fifth lease amendment.  Doc. No. 97-18.  In that amendment, Woodmont Hay Creek assented to pay Gordmans' FFE.  Id. at 2.  Once Woodmont Land Company's earnest money contract terminated, however, Gordmans canceled the original lease altogether.  Doc. No.

97-1, p. 2.  With construction of Gordmans' space at the Hay Creek Shops already in progress, Gordmans engaged in new lease negotiations with HCD.  Doc. No. 85-6 at 64:7-15.  Coslik, then purportedly acting as HCD's leasing agent, represented to HCD that it would not be responsible for paying Gordmans' FFE.  Id. at 106:3-12.  But when negotiations commenced, Gordmans demanded that HCD pay for the store's FFE because it was a standard lease provision.  Doc. No. 85-5 at 110:16-111:9.  The new lease—signed on June 8, 2015—required HCD to pay Gordmans' FFE at an eventual cost of $1,206,235.  Doc. Nos. 79-10; 97-19.

**Kirkland's**.  Woodmont Hay Creek entered into a lease with Kirkland's on November 7, 2014.  Doc. No. 79-4.  The lease required the landlord to deliver the premises by September 15, 2015.  See id.  A lack of progress on the space intended for Kirkland's spurred the Plaintiffs to notify HCD that Woodmont Hay Creek would not meet the delivery date.  Doc. No. 85-6 at 119:9-13.  Woodmont Hay Creek then assigned the lease to HCD on November 12, 2015.  Doc. No. 85-25.  Similar to the Mattress Firm situation, failure to meet the delivery date empowered Kirkland's to cancel the lease and seek liquidated damages.  Doc. No. 97-9.  In reaction, the Defendants negotiated a lease amendment with a six-month rent abatement to retain Kirkland's as a tenant.  Doc. No. 97-20.

Coslik responded to Knutson's letter declaring default under the LSA on November 23, 2016, denying Woodmont's responsibility for each allegation and contending that grounds did not exist to terminate the contract.  Doc. No. 79-16.  On December 16, 2016, an attorney for LaSalle sent a reply letter invoking the LSA's termination clause, deeming Woodmont's response insufficient to cure the asserted defaults.  Doc. No. 79-17.  This action ensued.

### C.      Procedural History

The Plaintiffs filed their complaint on April 7, 2017.  Doc. No. 1.  On July 7, 2017, the Defendants responded with an answer and counterclaim.  Doc. No. 17.  With leave from the Court, the parties filed amended pleadings, culminating in the Plaintiffs' first amended complaint, filed on June 21, 2018, and the Defendants' second amended counterclaim, filed on December 19, 2017.  Doc. Nos. 39, 52.  Both parties moved for summary judgment on August 12, 2019 and submitted timely response and reply briefs thereafter.  Doc. Nos. 77, 80.

## II.   DISCUSSION

Summary judgment is required "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "An issue is 'genuine' if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party."  Schilf v. Eli Lilly & Co., 687 F.3d 947, 948 (8th Cir. 2012) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  "A fact is material if it 'might affect the outcome of the suit.'"  Dick v. Dickinson State Univ., 826 F.3d 1054, 1061 (8th Cir. 2016) (quoting Anderson, 477 U.S. at 248). Courts must afford "the nonmoving party the benefit of all reasonable inferences which may be drawn without resorting to speculation." TCF Nat'l Bank v. Mkt. Intelligence, Inc., 812 F.3d 701, 707 (8th Cir. 2016) (quoting Johnson v. Securitas Sec. Servs. USA, Inc., 769 F.3d 605, 611 (8th Cir. 2014)).  "At summary judgment, the court's function is not to weigh the evidence and determine the truth of the matter itself, but to determine whether there is a genuine issue for trial." Nunn v. Noodles & Co., 674 F.3d 910, 914 (8th Cir. 2012) (citing Anderson, 477 U.S. at 249).  If the movant demonstrates the absence of a genuine issue of material fact, "[t]he nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must

come forward with 'specific facts showing that there is a genuine issue for trial.'" <u>Torgerson v. City of Rochester</u>, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986)).

The Plaintiffs' first amended complaint pleads a variety of contract claims grounded on the LSA and the DSA, as well as equitable claims.  <u>See</u> Doc. No. 52.  Count I contends that LaSalle breached the LSA by terminating the contract without sufficient cause.  Count II alleges two separate breaches of the DSA: first, that LaSalle's purported wrongful termination of the LSA impeded Woodmont Hay Creek from attaining the 95% leasing threshold necessary to receive the Phase 2 Construction Management Bonus, and second, that LaSalle failed to pay Woodmont Hay Creek the Construction Management Fee equal to 2% of the total project costs.  Count III seeks a declaratory judgment finding that LaSalle improperly terminated the LSA.  Count IV, in addition to requesting attorney's fees generally, invokes the specific attorney's fees provision in the DSA.  Counts V and VI present equitable claims for unjust enrichment and quantum meruit, asserting the Defendants wrongfully withheld payments and refused to compensate the Plaintiffs for services rendered.

The Defendants' second amended counterclaim, meanwhile, focuses on Woodmont's alleged breaches of the LSA and advances multiple theories aimed at retracting the commissions paid to Woodmont for leasing services.  <u>See</u> Doc. No. 39.  Count I relies on North Dakota Century Code § 43-23-05—the statute that requires licensure to sell or lease real estate in North Dakota— to request remittance of all commissions previously paid to Woodmont for Phase 2.  Count II alleges that Woodmont committed six distinct breaches of the LSA, as alluded to above.  Count III is a declaratory judgment claim seeking a determination that the DSA's Construction Management Bonus provision is unenforceable.  Counts IV and V contend that the Plaintiffs

violated North Dakota's unlawful sales and advertising practices statute, codified at § 51-15-02 of

the Century Code, by entering into the LSA and DSA under the auspices that they held proper

licensure.  Because several claims overlap, the Court will address the issues raised on summary

judgment by topic.

### A.      Enforceability of Agreement for Leasing Services

Of paramount importance to the claims arising under the LSA is the effect of Woodmont's

admitted lack of a North Dakota real estate license while acting as the Defendants' leasing agent.

North Dakota's statute requiring licensure for real estate brokers provides in relevant part:

> No person may act as a real estate broker or real estate salesperson, or advertise or
> assume to act as such real estate broker or real estate salesperson, without a license
> issued by the real estate commission. No person is entitled to collect any fees,
> compensation, or commission as a real estate broker or real estate salesperson
> without having first complied with the provisions of this chapter.

N.D. Cent. Code § 43-23-05.  Violation is punishable as a class B misdemeanor.  N.D. Cent. Code

§ 43-23-17.  "Real estate broker" is defined in part as:

> any person that, for another, for a fee, commission, salary, or other consideration
> . . . either directly or indirectly by a continuing course of conduct or by a single act
> or transaction . . . [n]egotiates or offers, attempts, or agrees to negotiate the sale,
> exchange, purchase, or leasing of real estate or any interest in that real estate.

N.D. Cent. Code § 43-23-06.1(9).  Beyond question, Woodmont acted as a real estate broker for

the Defendants within this definition, for which the company received $442,741.36 in

commissions for Phase 2.  See Doc. No. 83-1.

The Defendants contend that Woodmont's lack of licensure rendered performance of the

LSA unlawful.   In opposition, the Plaintiffs assert that Woodmont comported with legal

requirements because the contract called for application of Texas law, and Coslik and Gary

possessed Texas real estate licenses.  The Court agrees with the Defendants, finding that

Woodmont is barred from enforcing the LSA.

A contract that contravenes public policy is void.  N.D. Cent. Code §§ 9-04-03, 9-08-01, 9-08-02; Erickson v. N.D. State Fair Ass'n of Fargo, 211 N.W. 597, 599 (N.D. 1926) ("There can be no question but that a contract to do an act forbidden by express provision of law or contrary to the policy of express law is illegal and unenforceable.").  Resting on public policy rationales, the North Dakota Supreme Court has consistently refused to enforce contracts where a party lacks required licensure—nearly dating back to statehood.  See, e.g., Preference Pers., Inc. v. Peterson, 2006 ND 35, ¶ 10, 710 N.W.2d 383 (holding unlicensed employment agency could not enforce contract); Ranta v. McCarney, 391 N.W.2d 161, 163 (N.D. 1986) (holding out-of-state attorney without license to practice law in North Dakota could not recover fees for legal services rendered in state); Hosmer v. Sheldon Sch. Dist. No. 2 of Ransom Cty., 59 N.W 1035, 1037 (N.D. 1894) (holding teaching contract with individual lacking necessary certificate unenforceable); Goose River Bank v. Willow Lake Sch. Twp., 44 N.W. 1002, 1002 (N.D. 1890) (same).

 For example, in Preference Personnel, an attorney contracted with an employment agency in the hope of landing a job in the tax law field.  2006 ND 35, ¶ 2, 710 N.W.2d 383.  At the time the parties entered into the contract, the employment agency's license had lapsed.  Id. at ¶ 4.  As promised, the employment agency placed the attorney at a tax law firm.  Id. at ¶ 3.  Then the attorney promptly quit and refused to pay the placement fee.  Id.  The employment agency sued for breach of contract.

On appeal, the North Dakota Supreme Court declined to enforce the contract.  The pertinent licensing statute proscribed a person from operating an employment agency physically located in North Dakota without first procuring a license, with violation carrying a class B misdemeanor penalty.  Id. at ¶ 8 (quoting N.D. Cent. Code § 34-13-02).  Even though the licensing statute did not overtly "prohibit the enforcement of a contract between an individual and an unlicensed

employment agency," the court explained that the statute evinced an apparent intent "to provide protection to our citizens by establishing extensive licensing requirements before operating."  Id. at ¶ 9.  The court went on to determine that "[i]f public policy considerations require employment agencies to undergo extensive licensing requirements before being allowed to legally conduct business in this State, it follows that it is against the public policy of this State to enforce a contract between an individual and an unlicensed employment agency."  Id. at ¶ 10.  As a result, the court affirmed dismissal of the employment agency's breach of contract claim.

Identical principles preclude Woodmont from enforcing the LSA.  Section 43-23-05 flatly prohibits any person from acting as a real estate broker in North Dakota without a license.  Like the state's employment agency statute, the purpose of the statute requiring real estate brokers to obtain licensure is to protect the public.  Muscatell v. N.D. Real Estate Comm'n, 546 N.W.2d 374, 377 (N.D. 1996).  The statutory scheme at issue here similarly includes extensive licensing requirements, including an examination, continuing education, and a criminal background check.  See N.D. Cent. Code §§ 43-23-08, 43-23-08.2, 43-23-08.4.  Public policy considerations therefore command that North Dakota courts would refuse to enforce a contract between an unlicensed real estate broker and an individual or business entity.  The undisputed facts illustrate that Woodmont entered into the LSA with the Defendants to act as a real estate broker for property located in North Dakota without procuring a license.  The LSA is consequently void as against public policy, preventing Woodmont from enforcing the contract.

Trying to sidestep this conclusion, the Plaintiffs retreat to the LSA's Texas choice-of-law clause.  A federal court sitting in diversity applies the choice-of-law rules of the state in which it sits.  Klaxon v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941).  "North Dakota has recognized that the parties may stipulate as to choice of law."  Mitchell v. DynCorp Int'l, LLC, Case No. 3:11-

cv-90, 2012 WL 12860119, at *5 (D.N.D. June 21, 2012) (citations omitted).  Choice-of-law

clauses are ineffective, however, when application of another state's law would result in

enforcement of a contract that thwarts North Dakota public policy.  See Osborne v. Brown &

Saenger, Inc., 2017 ND 288, ¶ 16, 904 N.W.2d 34; see also Restatement (Second) of Conflict of

Laws § 187(2)(b) (Am. Law Inst. 1971) (stating that courts will not enforce a choice-of-law clause

if doing so would contravene a fundamental policy of a state with a materially greater interest in

the determination of the issue and if that state's law would control in the absence of the choice-of-

law clause).

Application of Texas law here would result in enforcement of a contract for the

performance of real estate brokerage services in North Dakota without a license as proscribed by

§ 43-23-05.  As explained, North Dakota courts would not enforce such a contract for public policy

reasons.  North Dakota also has a materially greater interest in enforcing its licensure requirements

for real estate transactions within its borders than Texas does in regulating its licensees' out-of-

state transactions.  And absent the choice-of-law clause, North Dakota law would govern.  The

LSA calls for performance of leasing services for a shopping center located in North Dakota, where

the Defendants are domiciled.  The contract's sole connection to Texas is Woodmont's domicile.

From a macro perspective, enforcing the parties' choice-of-law provision in this instance would

invite professionals licensed in any other state in the country to circumvent North Dakota's myriad

licensure requirements with impunity by inserting a one-sentence clause in their contracts.  Stated

mildly, that outcome is unsound.  The LSA's choice-of-law clause is ineffective to prevent

application of § 43-23-05.

Because Woodmont cannot enforce the LSA, summary judgment is required on the

Plaintiffs' breach of contract and declaratory judgment claims that assert the Defendants

wrongfully terminated the contract.  Any equitable claims that rely on leasing services provided under the LSA fail for similar reasons.  See Snider v. Dickinson Elks Bldg., LLC, 2018 ND 55, ¶ 14, 907 N.W.2d 397 (finding contractor barred from recovering on quantum meruit and unjust enrichment during time period prior to obtaining statutorily required license); Goose River Bank, 44 N.W. at 1002 (deeming quantum meruit foreclosed where contract was void for violating public policy).

    With that established, the inquiry now becomes whether the Defendants can enforce the LSA.  Ordinarily, a court "will not aid either party to an illegal agreement, but will leave the parties where it finds them." Janzen v. Crum, 197 N.W. 138, 139 (N.D. 1924).  Yet there is an operative equitable exception.  Where a contract is void because one party fails to comply with a licensure requirement, the other party may still recover damages for a breach of the contract if that party is included in the class of persons the licensure requirement is designed to protect.  Restatement (Second) of Contracts § 181 (Am. Law Inst. 1981); see also id. § 181 cmt. d, illus. 5.

    The Defendants belong to the class of persons § 43-23-05 was enacted to protect.  By mandating extensive licensing requirements, the statute's primary purpose is to protect North Dakota individuals and businesses from incompetent real estate brokers.  Woodmont failed to comply with those requirements, and the Defendants now claim that they incurred damages from Woodmont's deficient real estate brokerage services.  In that sense, barring the Defendants from enforcing the LSA on public policy grounds would run directly contrary to the statute's purpose by allowing an unlicensed broker to dodge liability for allegedly faulty performance.  Therefore, the Defendants are not precluded from enforcing the LSA, and their breach of contract allegations may proceed.

### B.        Woodmont's Breach of the LSA

The Court turns now to the Defendants' six discrete allegations that Woodmont breached the LSA.[5]  Several preliminary matters require attention.  To start, although North Dakota Century Code § 43-23-05 applies to the LSA, "different states' law may be applied to different aspects of the controversy."  Nodak Mut. Ins. Co. v. Wamsley, 2004 ND 174, ¶ 10, 687 N.W.2d 226 (alteration and citation omitted).  Woodmont's domicile provides a reasonable basis for the selection of Texas law, and Texas law germane to breach of contract actions does not contravene North Dakota public policy.  Thus, the Court will apply Texas law to the Defendants' breach of contract claim.  See Chapman v. Hiland Partners GP Holdings, LLC, Case No. 1:13-cv-052, 2015 WL 12591722, at *3 (D.N.D. Apr. 23, 2015).

To prevail, the Defendants must demonstrate: "(1) the existence of a valid contract; (2) performance, or tendered performance, by the [Defendants]; (3) breach of the contract by [Woodmont]; and (4) damages to the [Defendants] resulting from that breach."  Restrepo v. All. Riggers & Constructors, Ltd., 538 S.W.3d 724, 740 (Tex. App.—El Paso 2017, no writ) (citation omitted).  "A breach of contract occurs when a party fails or refuses to do something it has promised to do."  AKIB Constr. Inc. v. Shipwash, 582 S.W.3d 791, 806 (Tex. App.—Houston [1st Dist.] 2019, no writ) (citations omitted).  "Whether a party has breached a contract is a question of law for the court, not a question of fact for the jury."  Byrd v. Estate of Nelms, 154 S.W.3d 149, 161 (Tex. App.—Waco 2004, writ denied) (citations omitted).  "The court determines what conduct is required by the parties, and, insofar as a dispute exists concerning the failure of a party

---

[5] Notwithstanding the Defendants' blanket assertion that summary judgment should be denied on their breach of contract claim because of Woodmont's lack of licensure, each alleged breach remains subject to scrutiny for legal sufficiency.  However, because LaSalle did not wrongfully terminate the LSA, the Court need not address whether any of the alleged breaches were material.

to perform the contract, the court submits the disputed fact questions to the jury."  Ohrt v. Union Gas Corp., 398 S.W.3d 315, 323-24 (Tex. App.—Corpus Christi 2012, writ denied) (citation omitted).  In addition to explicit contractual duties, "it is well-established in Texas jurisprudence that accompanying every contract is a common-law duty to perform with care, skill, reasonable expedience and faithfulness the thing agreed to be done, and a negligent failure to observe any of these conditions is a . . . breach of contract."  City of Port Isabel v. Shiba, 976 S.W.2d 856, 858 (Tex. App.—Corpus Christi 1998, writ denied) (cleaned up).

One more issue bears mentioning.  The Defendants' original counterclaim, first amended counterclaim, and second amended counterclaim uniformly allege that Woodmont (and Woodmont alone) breached the LSA (and the LSA alone).  See Doc. Nos. 17, 32, 39.  But in their response to the Plaintiffs' summary judgment motion, the Defendants suddenly assert that Woodmont also breached statutory fiduciary duties as a real estate broker, and that Woodmont Hay Creek breached the DSA.  "[W]hile . . . the pleading requirements under the Federal Rules are relatively permissive, they do not entitle parties to manufacture claims, which were not pled, late into the litigation for the purpose of avoiding summary judgment."  N. States Power Co. v. Fed. Transit Admin., 358 F.3d 1050, 1057 (8th Cir. 2004); accord Rodgers v. City of Des Moines, 435 F.3d 904, 909-10 (8th Cir. 2006) (affirming district court's refusal to consider unpled allegations on summary judgment).  The Defendants' newfound allegations measurably deviate from the pleadings.  Breach of fiduciary duty is a tort—in an entirely separate legal hemisphere than the pleaded breach of contract claim.  See In re Estate of Vendsel, 2017 ND 71, ¶ 14, 891 N.W.2d 750 (citation omitted).  And the Defendants' other theory is that a different party breached a different contract.  Twice the Defendants sought and obtained leave to amend their counterclaim,

20

and nothing stopped them from doing so a third time to include these allegations.  The Court declines to consider the Defendants' unpled claims at this late stage.

Per the pleadings, the Court's analysis focuses squarely on whether Woodmont breached the LSA on or after October 27, 2015.  Construing the facts in the light most favorable to the Defendants, only Woodmont's alleged deficient performance related to the Carter's/Oshkosh and Dollar Tree leases escapes summary judgment.

**Carter's/Oshkosh**.   The Plaintiffs argue that Woodmont did not have a duty to consummate leases with particular tenants,[6] so the failure to procure a lease from Carter's/Oshkosh is insufficient to form the basis for a breach of contract.  The Defendants respond that Woodmont made multiple representations that Carter's/OshKosh intended to sign a lease at the Hay Creek Shops based on the original letter of intent.  Further, Knutson testified in his deposition that a lack of diligence over a two-year period resulted in Carter's/Oshkosh becoming frustrated and losing confidence in Woodmont's ability to negotiate an acceptable lease, which led to the less favorable letters of intent and the deal falling through altogether.  See Doc. No. 85-5 at 85:23-86:11.

The Court recognizes that the LSA did not impose a duty on Woodmont to consummate specific leases.   Nevertheless, Woodmont did have contractual duties to "cooperate with [Defendants] in marketing and leasing the Project, all in conformity with the [Defendants'] financial objectives," as well as to engage in "negotiation of . . . leases" with prospective lessees.

---

[6] In response to many of the allegations, the Plaintiffs repeatedly assert that Woodmont's lone duty under the LSA was to generate potential tenants that were ready, willing, and able to sign leases. But that duty comes into play only to determine whether a broker is entitled to a commission, which is not at issue.  See Carpenter (Tex.) Realty Corp. v. Allen Ctr. Co. No. 4, 974 S.W.2d 808, 818-19 (Tex. App.—Houston [14th Dist.] 1998, writ denied).  Instead, most of the disputes center on Woodmont's alleged failures to negotiate leases and perform other delegated tasks pursuant to the express terms of the LSA—with care, skill, reasonable expedience, and faithfulness as required by Texas law.  The Plaintiffs cannot so easily brush aside the terms of the contract Woodmont agreed to perform.

Doc. No. 79-1, p. 5.  Texas law mandated performance of these obligations with reasonable expedience and faithfulness.  Crediting Knutson's version of events, a rational jury could conclude that Woodmont breached the LSA by failing to diligently pursue lease negotiations, causing the Defendants to lose the opportunity to secure Carter's/Oshkosh as a tenant.

**Mattress Firm**.  The Defendants take issue with Woodmont failing to communicate an October 1, 2015 delivery date for Mattress Firm in a lease that Woodmont Hay Creek held until June 3, 2016.  When Woodmont Hay Creek assigned the lease to LaSalle, Mattress Firm received a seven-month rent abatement.  The Defendants also rely on a purported admission of fault tendered when Woodmont Hay Creek consented to pay half the rent abatement contingent on receipt of the Construction Management Bonus, which never materialized.  The Plaintiffs reply that LaSalle accepted assignment of the lease with full knowledge of the missed delivery date and agreed to assume the resulting rent liability.

Concentrating solely on whether Woodmont breached the LSA, the Court cannot find fault here.  The LSA in no way required Woodmont, as leasing agent, to ensure a previous landlord met a delivery date.  Even assuming Woodmont had a duty to at least inform the Defendants of a missed delivery date in a lease Woodmont Hay Creek held, the deadline had already passed when the parties entered into the LSA on October 27, 2015.  And the record illustrates that the Defendants were aware of the problem by February 2016 at the latest, and likely earlier.  See Doc. Nos. 85-7 at 36:11-37:7; 97-9.  The Defendants aim the remainder of their arguments at Woodmont Hay Creek.  But Woodmont Hay Creek was not a party to the LSA.  For that reason, Woodmont Hay Creek's offer to cover half the rent abatement is irrelevant because that offer had nothing to do with Woodmont providing leasing services under the LSA.  This alleged breach comes up short.

**Pro Forma Lease Statements**.  The Plaintiffs first contend that no breach exists here because the LSA did not impose standards for the provision of pro forma lease statements.  The Court disagrees that Woodmont had no duty to tender information for pro forma statements when requested.  The LSA calls for compliance with "such other tasks as [Defendants] may reasonably request in order to assist [Defendants] in achieving . . . financial objectives for the Project."  Doc. No. 79-1, p. 5.  Providing information for pro forma statements fits comfortably within that purview, and failure to diligently supply such information when asked for could support a breach of the LSA.

Even so, the Court agrees with the Plaintiffs' second argument: The Defendants have failed to show that damages flowed from any alleged tardiness or variation related to the pro forma statements.  Despite the Plaintiffs specifically raising the issue, the Defendants' briefing never broaches damages.  In their depositions, Knutson and Splonskowski merely expressed frustration with Woodmont frequently submitting information late and with inconsistencies.  Doc. Nos. 85-5 at 94:24-95:24; 85-6 at 164:16-166:20.  The closest thing to a theory of damages comes from Porter's deposition, when he stated that LaSalle delayed making some business decisions while waiting on the pro forma statements.  Doc. No. 85-7 at 41:16-42:21.  That still does not identify "any loss or damage actually sustained as a result of the breach."  Shipwash, 582 S.W.3d at 808.  The Defendants have not sustained their burden to produce evidence of damages, so this claim falters, too.

**Dollar Tree/Michaels**.  The crux of the Defendants' argument is that Woodmont failed to review the leases with Dollar Tree and Michaels to check for conflicting exclusive use grants, resulting in a $66,586 rent concession.  The Defendants note that they had already expended significant funds to build the space for Dollar Tree before Gary informed them of the conflicting

lease terms.  The Plaintiffs counter by pointing out that the final decision to approve the Dollar Tree lease and the rent concession with Michaels rested with the Defendants.

Though the Plaintiffs' argument is true, it disregards Woodmont's duties under the LSA. Woodmont consented to negotiate leases with prospective lessees and to execute that task with care and skill.  That means before the Defendants faced any final decision on a lease, they had a contractual right to expect Woodmont to competently negotiate the lease with their financial objectives in mind.  In this instance, the allegation is that Woodmont neglected to check for conflicting exclusive uses and did not inform the Defendants of the conflict with the Michaels lease until near the eve of Dollar Tree opening for business.  This left the Defendants with two undesirable choices: lose Dollar Tree as a prospective tenant or negotiate a costly waiver of Michaels' exclusive use.  On these facts, a reasonable jury could find that Woodmont breached the LSA.

**Gordmans**.  The Defendants' chief complaint is that Coslik incorrectly represented that HCD would not bear responsibility to pay for Gordmans' FFE.  When push came to shove, Gordmans demanded that HCD pay for the store's FFE because it was a standard lease provision, and HCD acceded.  The glaring roadblock is that HCD inked the lease consenting to pay for Gordmans' FFE on June 8, 2015—more than four months before signing the LSA with Woodmont. Doc. No. 79-10.  A contract, of course, must exist before it can be breached.  Sensing this deficiency, the Defendants attempt to keep the claim afloat by hinting at Woodmont incurring statutory duties as their leasing agent before the LSA took effect.  As already explained, the Court will not entertain unpled breach of fiduciary duty allegations to stave off summary judgment on a breach of contract claim.  Simply put, the Defendants' claim stemming from the Gordmans lease is fatally defective because the alleged breach occurred before the LSA existed.

**Kirkland's**.  Akin to the Mattress Firm lease, the Defendants charge Woodmont with failing to meet a September 15, 2015 delivery date in the Kirkland's lease, resulting in a six-month rent abatement.   The Defendants contend that Woodmont's lack of communication and coordination with Woodmont Hay Creek caused the missed deadline.  Again, Woodmont did not have an obligation under the LSA to ensure Woodmont Hay Creek met a delivery date.  And here, the Defendants admit that Woodmont prospectively told them that Woodmont Hay Creek would miss the delivery date.  Doc. No. 85-6 at 119:9-17.  So from the moment the LSA took effect on October 27, 2015, the Defendants knew of the problem.  The decision to then accept assignment of the lease on November 12, 2015 fell to the Defendants.  Woodmont Hay Creek's actions prior to assigning the lease are not pertinent to a breach of the LSA.  This claim cannot proceed.

All in all, summary judgment is warranted on the Defendants' breach of contract claims pertaining to the Mattress Firm, Gordmans, and Kirkland's leases, as well as on the claim deriving from Woodmont's provision of pro forma lease statements.   Woodmont's alleged failures to adequately perform under the LSA when negotiating the Carter's/Oshkosh and Dollar Tree leases present contested questions of material fact for a jury to resolve.

### C.     Defendants' Breach of the DSA

The next cluster of disputes emanates from the DSA.  The Plaintiffs assert that (1) the purported wrongful termination of the LSA prevented them from attaining the Phase 2 Construction Management Bonus, and (2) the Defendants improperly withheld payment of the Construction Management Fee equal to 2% of the total project costs.  The parties concur that the DSA is governed by North Dakota law.

25

1.    Construction Management Bonus

Section 5.2 of the DSA required the Defendants to pay the $750,000 Construction Management Bonus "upon [Woodmont Hay Creek], either directly or through [Woodmont] as an approved affiliate of [Woodmont Hay Creek], leasing ninety-five percent (95%) of the commercial retail space available for lease in Phase 2 of the Project."   Doc. No. 79-18, pp. 9-10.   The Defendants posit that section 5.2 is unenforceable because payment was contingent on leasing services for which the Plaintiffs lacked a North Dakota real estate license.   They also note that Phase 2 never reached 95% leasing, contending they would not be obligated to pay the Construction Management Bonus even if section 5.2 were enforceable.   In defense, the Plaintiffs argue the DSA did not require Woodmont Hay Creek itself to engage in leasing to obtain the Construction Management Bonus.   And while acknowledging the 95% leasing threshold was not met, the Plaintiffs resist summary judgment by claiming the Defendants' wrongful termination of the LSA obstructed them from achieving the target.

The Court concludes that § 43-23-05 expressly prohibits Woodmont Hay Creek from recovering the Construction Management Bonus.   To refresh, the statute states that "[n]o person is entitled to collect any fees, compensation, or commission as a real estate broker" in North Dakota without a license.   N.D. Cent. Code § 43-23-05.   A "real estate broker" includes one who "either directly or indirectly . . . [n]egotiates or offers, attempts, or agrees to negotiate the sale, exchange, purchase, or leasing of real estate or any interest in that real estate."   N.D. Cent. Code § 43-23-06.1(9) (emphasis added).   The DSA's plain language calls for Woodmont Hay Creek to lease 95% of the available Phase 2 commercial space either directly—or indirectly through Woodmont as an approved affiliate.   Neither entity possessed a North Dakota real estate license, meaning § 43-23-05 bars recovery and renders section 5.2 unenforceable.   Violation of the statute cuts off

26

é

related equitable remedies, too.  See Snider, 2018 ND 55, ¶ 14, 907 N.W.2d 397; Goose River Bank, 44 N.W. at 1002.  Furthermore, the Plaintiffs' Construction Management Bonus claim fails independently because the Defendants did not wrongfully terminate the LSA, and the 95% leasing benchmark for Phase 2 never occurred.

Unlike the LSA, however, the Plaintiffs' lack of licensure does not leave the DSA wholesale unenforceable.  The Century Code states, "When a contract has several distinct objects, of which one at least is lawful and one at least is unlawful in whole or in part, the contract is void as to the latter and valid as to the rest."  N.D. Cent. Code § 9-04-04.  The DSA contained multiple distinct objects, including the performance of services that did not require a real estate license, such as securing government permits, reviewing design plans, and participating in project management.  Although section 5.2 is unenforceable, the provisions in the DSA unrelated to leasing services remain valid.

2.    Construction Management Fee

By failing to pay Woodmont Hay Creek the Construction Management Fee contemporaneously with expenditures for total project costs, the Defendants breached the DSA.  The DSA also did not require Woodmont Hay Creek to accept the waiver-conditional payment tendered with Knutson's February 1, 2017 letter.  All involved agree that Woodmont Hay Creek remains entitled to 2% of the total project costs.  The Court therefore grants the Plaintiffs' affirmative summary judgment motion on the merits of this claim.

The issue of damages persists.  In cross-moving for summary judgment, the Defendants peg an exact dollar figure on the amount owed.  As calculated in the summary included with Knutson's letter, the Defendants assert that Woodmont Hay Creek is owed $215,949.32 for the Construction Management Fee.  Doc. No. 84-1.  While concurring that Woodmont Hay Creek is

owed at least that amount, the Plaintiffs claim that they may be entitled to more compensation because they have not reviewed the underlying documents the Defendants relied on in arriving at the figure.

Mere speculation is inadequate to avoid summary judgment. The Plaintiffs fail to point to any evidence in the record calling the Defendants' number into doubt. They likewise fail to explain why they were unable to obtain the underlying documents through discovery. Nor have they asked the Court to defer considering the pending motions to allow for additional discovery. See Fed. R. Civ. P. 56(d) (establishing the procedure for a nonmovant when facts are unavailable to justify opposition to summary judgment). Absent specific facts to the contrary, the Court finds as a matter of law that the Plaintiffs are entitled to $215,949.32 for the Construction Management Fee. This award extinguishes the Plaintiffs' remaining equitable claims. See Erickson v. Brown, 2008 ND 57, ¶ 39, 747 N.W.2d 34 (citations omitted) ("A party with an adequate remedy at law generally is not entitled to an equitable remedy."). The Court reserves ruling on attorney's fees, costs, and prejudgment interest based on the Construction Management Fee award until the conclusion of this matter.

### D.    Recovery of Paid Commissions

For the final bundle of claims, the Defendants take two tracks in an attempt to claw back the $442,741.36 in commissions paid to Woodmont for leasing services. First, they assert that § 43-23-05 itself authorizes recovery of commissions paid to an unlicensed real estate broker. Second, they advance two claims for damages under North Dakota's unlawful sales and advertising practices statute.

1.      Real Estate License Required Statute

The express language of § 43-23-05 is confined to preventing an unlicensed broker from recovering compensation from a client retrospectively.  It does not address the reverse situation where a client seeks to recoup commissions already paid to an unlicensed broker.  Without express language, recovery must rest on an implied right of action.

"Whether a statute creates a private right of action is a question of legislative intent." Vogel v. Marathon Oil Co., 2016 ND 104, ¶ 12, 879 N.W.2d 471 (citation omitted).  "The legislature's silence in failing to expressly provide a private right of action is a strong indication it did not intend such a remedy."  Trade 'N Post, L.L.C. v. World Duty Free Ams., Inc., 2001 ND 116, ¶ 14, 628 N.W.2d 707 (citations omitted).  "The party urging an implied right of action therefore bears the burden of proof to establish the legislature intended to create the remedy."  Id. (citation omitted). To meet this burden, the Defendants must satisfy a three-part test that probes:

> (1) whether the plaintiff is one of the class for whose special benefit the statute was enacted; (2) whether there is an indication of legislative intent, explicit or implicit, either to create such remedy or to deny one; and (3) whether it is consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff.

Empower the Taxpayer v. Fong, 2012 ND 119, ¶ 4, 817 N.W.2d 381 (citation omitted).  For the second factor, the Defendants must demonstrate that "the legislature intended to create a private right of action for damages . . . through the language and focus of the statute, the legislative history, or the statutory purpose."  Vogel, 2016 ND 104, ¶ 12, 879 N.W.2d 471 (citation omitted).

At the outset, the Defendants rely on Olson v. Alerus Financial Corp., 2015 ND 209, 868 N.W.2d 851, to contend that the availability of a private civil remedy under § 43-23-05 is settled law.  To be sure, Olson holds surface appeal.  In that case, the North Dakota Supreme Court expansively stated, "Chapter 43-23, N.D.C.C., when read as a whole demonstrates a legislative

intent to create a private remedy to enforce violations of the statutes."  Id. at ¶ 26.  But a more careful reading is necessary.

The precise question the court confronted in Olson was whether North Dakota Century Code § 43-23-12.1(1) permitted a private right of action.  That section codifies real estate brokers' fiduciary duties to clients.  The court found legislative intent to create a private remedy for breach of the statutory fiduciary duties for three reasons.  First, the statute imposed specific duties on real estate brokers to clients.  Second, the statutory duties expressly abrogated the common law, which unquestionably supported private civil actions before codification.  And third, chapter 43-23 required real estate brokers to carry errors and omissions insurance, showing that the legislature contemplated brokers facing civil liability.  See id.

The justifications for a private right of action in Olson are inapposite here.  Section 43-23-05 creates a regulatory obligation, not duties to clients.  Moreover, the licensing statute does not coopt preexisting civil remedies.  Though not overtly stated in Olson, the statutory fiduciary duties at issue there would have been rendered essentially meaningless without an attendant private right of action.  Codifying a common-law civil action only to eliminate its private enforcement would make little sense.  In contrast, § 43-23-05 is accompanied by robust enforcement mechanisms.  For example, the attorney general possesses the authority to investigate and prosecute a licensing violation as a criminal offense.  N.D. Cent. Code § 43-23-17.  Further, the North Dakota Real Estate Commission is authorized to seek an injunction to prevent an unlicensed individual or entity from continuing to act as a real estate broker.  N.D. Cent. Code § 43-23-18.  An analogy to the errors and omissions insurance requirement is similarly askew because that directive applies only to licensed real estate brokers.  See N.D. Cent. Code § 43-23-19 (mandating real estate brokers carry errors and omissions insurance "as a condition of licensure").

Finally, despite the sweeping language from earlier in the <u>Olson</u> opinion, the North Dakota

Supreme Court encapsulated its analysis this way:

> Section 43-23-12.1(1), N.D.C.C., imposed a fiduciary duty on [the defendant].
> That same section, together with the remaining portions of N.D.C.C. ch. 43-23
> relating to abrogation of the common law and the need for errors and omissions
> insurance, created a private right of action, allowing a claim by the [plaintiffs].

<u>Olson</u>, 2015 ND 209, ¶ 27, 868 N.W.2d 851.   Considering this narrower language and the

decision's underlying reasoning, the Court finds that <u>Olson</u> did not resolve the question of whether

§ 43-23-05 creates a private right of action.

Turning to that question, the Defendants have not carried the burden to demonstrate that

the North Dakota legislature intended to create a private right of action under § 43-23-05.[7]  The

statutory scheme explicitly entrusts enforcement of licensing violations to the attorney general and

the North Dakota Real Estate Commission, making no mention of private enforcement.  <u>See</u> N.D.

Cent. Code §§ 43-23-17, 43-23-18.  As the North Dakota Supreme Court has stated, "[i]t is not

within the competence of the judiciary to amend these comprehensive enforcement schemes by

adding to them another private remedy not authorized nor intended by [the legislature]."  <u>Trade 'N</u>

<u>Post</u>, 2001 ND 116, ¶ 17, 628 N.W.2d 707 (alteration in original) (quoting <u>R. B. J. Apartments,</u>

<u>Inc. v. Gate City Sav. & Loan Ass'n</u>, 315 N.W.2d 284, 289 (N.D. 1982)).   In line with this

reasoning, other courts have determined that comparable statutes requiring real estate licensure do

not provide private rights of action for clients.  <u>See, e.g.</u>, <u>Altamirano v. Matsu, LLC</u>, Case No. CV

12-06023 GAF (AJWx), 2012 WL 13164153, at *5 (C.D. Cal. Sept. 26, 2012) (finding no implied

private right of action for clients under California statute requiring real estate brokers to obtain

licensure); <u>Scott v. Gage</u>, Case No. 6:11-cv-1565-Orl-31DAB, 2011 WL 13196262, at *5 (M.D.

---

[7] Because the Defendants cannot establish legislative intent, the Court need not address the
remaining factors.  <u>See</u> <u>Empower the Taxpayer</u>, 2012 ND 119, ¶ 5, 817 N.W.2d 381.

Fla. Dec. 12, 2011) (same, Florida law); <u>Luria v. Heiman</u>, Case No. EDCV 07-1282-VAP (JCRx), 2008 WL 11342627, at *3 (C.D. Cal. Apr. 18, 2008) (same, Nevada law); <u>see also</u> <u>Semrad v. Edina Realty, Inc.</u>, 493 N.W.2d 528, 532 (Minn. 1992) (holding Minnesota Real Estate Brokers Act did not provide private right of action).

The purpose of the licensure requirement is to protect the public from incompetent real estate brokers, not to generate litigation opportunities for technical licensing violations.[8]  In a word, the legislature knew how to create a private remedy but chose not to.  Thus, the Court concludes that § 43-23-05 does not support a private right of action to recover commissions paid to an unlicensed real estate broker.  The Defendants' claim for damages under the statute consequently succumbs to summary judgment.

2.      Unlawful Sales and Advertising Practices

In a related vein, the Defendants accuse the Plaintiffs of misrepresenting their status as properly licensed real estate brokers.  The Defendants lodge two distinct claims for violations of North Dakota's unlawful sales and advertising practices statute, one against Woodmont Hay Creek under the DSA, and another against Woodmont under the LSA.  Pursuant to North Dakota Century Code § 51-15-02:

> The act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is declared to be an unlawful practice.

"Merchandise" is defined as "any objects, wares, goods, commodities, intangibles, real estate, charitable contributions, or services."  N.D. Cent. Code § 51-15-01(3).  A private right of action

---

[8] As explained in the next section, the legislature has provided a private right of action that covers more egregious circumstances where an unlicensed real estate broker knowingly mispresents licensure status to a client.

is authorized "against any person who has acquired any moneys or property by means of any practice declared to be unlawful in this chapter."  N.D. Cent. Code § 51-15-09.  Treble damages, as well as attorney's fees and costs, are available if a court finds that a defendant knowingly committed the unlawful conduct.  Id.  Private civil actions pursuant to § 51-15-09 are not restricted to consumer transactions.  Ackre v. Chapman & Chapman, P.C., 2010 ND 167, ¶ 23, 788 N.W.2d 344.

The Plaintiffs advance two unavailing initial arguments aimed at both claims.  They first assert that the LSA and the DSA fall outside the statute's scope because neither contract was for the sale of real estate.  This argument wholly ignores the word "services" in the statutory definition of merchandise.  One need look no further than the names of the two contracts to know that the Plaintiffs agreed to provide services to the Defendants.  Real estate leasing services fall within § 51-15-01(3)'s broad definition of merchandise.

Their second contention is that the statute is inapplicable to the LSA and the DSA because any alleged misrepresentation occurred during contract negotiations, and no money changed hands at the time the contracts were later formed.  The Court is unpersuaded.  The definition of "sale" includes an "offer for sale . . . [of] any merchandise for any consideration."  N.D. Cent Code § 51-15-01(5).  And the definition of "advertisement" includes "the attempt . . . oral or written, to induce, directly or indirectly, any person to enter into any obligation."  N.D. Cent Code § 51-15-01(1).  These terms are broad enough to encompass misrepresentations made during contract negotiations—all the more so considering the inclusive "in connection with" language in § 51-15-02.  Conversely, there is no textual basis to support a requirement that the unlawful conduct occur at the same time money is exchanged for merchandise.

Here, the Plaintiffs allegedly misrepresented that they possessed licensure to act as real estate brokers in North Dakota.  In connection with that purported misrepresentation, the parties entered into two contracts for the Plaintiffs to perform real estate leasing services.  That is sufficient to satisfy the basic elements of § 51-15-02.  Issues unique to the DSA and the LSA warrant further analysis.

        *a.*     *DSA Claim*

Section 51-15-09 is clear that a private cause of action cannot arise unless a person actually "acquired . . . moneys or property by means of" unlawful conduct.  The Defendants' DSA claim stalls on this condition because Woodmont Hay Creek never received compensation by means of the alleged licensure misrepresentation.  The LSA controlled the payment of commissions, and those commissions went to Woodmont.  With the leasing-contingent Construction Management Bonus claim defeated, the sole payment Woodmont Hay Creek will receive through the DSA is the Construction Management Fee.  That fee is unrelated to leasing services.  Notably, the Defendants acknowledge in their briefing that they have not paid Woodmont Hay Creek for services under the DSA that required a North Dakota real estate license.  See Doc. No. 94, p. 30 ("Such misrepresentations and deceptive practices were utilized to induce Defendants to enter into both the DSA and LSA, and actually resulted in the payment for said services by Defendants under the LSA.") (emphasis added); Doc. No. 104, p. 14 ("Woodmont received lease commission payments from Defendants under the LSA, and Woodmont Hay Creek seeks Bonus Compensation under the DSA.") (emphasis added).  Because an essential prerequisite for maintaining an action under § 51-15-09 is not met for the DSA, summary judgment is required.

> b.   *LSA Claim*

Now attempting to evade the Defendants' North Dakota unlawful practices claim, the Plaintiffs again lean on the LSA's Texas choice-of-law clause. The Court again deems the clause inapplicable. The LSA states narrowly, "The validity and construction of this Agreement shall be governed by the laws of the State of Texas." Doc. No. 79-1, p. 10. The provision's plain language is limited to contract disputes. Actions under § 51-15-09 sound in tort. Solidifying this notion is the availability of punitive damages when a defendant knowingly commits an unlawful practice. See Pioneer Fuels, Inc. v. Montana-Dakota Utilities Co., 474 N.W.2d 706, 709 (N.D. 1991) (citations omitted) ("Exemplary damages are not ordinarily recoverable in actions arising out of a breach of contract."). Additionally, federal courts require these claims to comply with the heightened pleading standard for fraud articulated in Rule 9(b) of the Federal Rules of Civil Procedure. See Olin v. Dakota Access, LLC, 910 F.3d 1072, 1076 (8th Cir. 2018).

When construing similar choice-of-law provisions phrased restrictively to apply to contract disputes, courts have found them ineffective to defeat claims pursuant to tort-based unfair trade practices statutes. See Carl Kelley Constr. LLC v. Danco Techs., 656 F. Supp. 2d 1323, 1339 (D.N.M. 2009); Country Club Assocs. v. Shaw's Supermarkets, Inc., 643 F. Supp. 2d 243, 252 (D. Conn. 2009). The Court finds these cases convincing. As a result, the Defendants' second claim under § 51-15-09 may proceed notwithstanding the LSA's choice-of-law clause.

Shifting to the merits, the Defendants affirmatively move for summary judgment on this claim, asserting there is no dispute that Woodmont knowingly mispresented its licensure status when entering into the LSA. But the record is not so unambiguous. "[A] claim for an unlawful practice is generally a question of fact. . . ." Ackre, 2010 ND 167, ¶ 25, 788 N.W.2d 344. Coslik admitted in hindsight that § 43-23-05 required licensure to sell or lease real estate in North Dakota.

That is not the same as admitting to knowing that licensure was required when entering into the contract or while performing leasing services—issues the record is silent on. Nor have the Defendants pointed to particular instances where Woodmont or its employees overtly represented themselves as possessing North Dakota licensure. Instead, the evidence at present shows that the topic came up only after the parties formed the LSA.[9] Ultimately, the trier of fact must determine whether Woodmont mispresented its licensure status or merely negligently failed to procure a license. The former is sufficient to support recovery. The latter is not. Genuine disputes of material fact remain on the Defendants' unlawful practices claim against Woodmont.

## III.   CONCLUSION

The Court has reviewed the record, the parties' filings, and the relevant legal authority. The Plaintiffs' motion for summary judgment (Doc. No. 77) is **GRANTED IN PART** and **DENIED IN PART**. Counts I, II (in part), and V of the Defendants' second amended counterclaim are **DISMISSED WITH PREJUDICE**. Triable issues of fact remain on the Defendants' surviving breach of contract and unlawful practices claims. The Defendants' summary judgment motion (Doc. No. 80) is likewise **GRANTED IN PART** and **DENIED IN PART**. With the exception of the Construction Management Fee claim in Count II and the accompanying request for attorney's fees, costs, and interest, the Plaintiffs' first amended complaint is **DISMISSED WITH PREJUDICE**. Upon final resolution of this matter, judgment shall be entered against the Defendants in the amount of $215,949.32. That award is subject to offset against any recovery the Defendants may obtain on their remaining claims.

---

[9] Splonskowski recalled in his deposition that an attorney for the Defendants sent a letter to Woodmont raising the licensure issue before the LSA's termination. Doc. No. 85-6 at 123:2-124:17. If so, the Court will be disinclined to award treble damages for commissions paid after the Defendants knew Woodmont lacked a North Dakota real estate license.

**IT IS SO ORDERED**.

Dated this 2nd day of June, 2020.

/s/ Peter D. Welte
Peter D. Welte, Chief Judge
United States District Court